# 7



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
666 FIFTH AVENUE
NEW YORK, NY 10103-0001

tel 212-506-5000
fax 212-506-5151
WWW.ORRICK.COM

November 14, 2006

Paul R. Gupta
212-506-5145
pgupta@orrick.com

**VIA E-MAIL**

Ralph J. Gabric, Esq.
Brinks Hofer Gilson & Lione
NBC Tower, Suite 3600
455 North Cityfront Plaza Drive
Chicago, IL 60611

**PROVIDED UNDER FRE 408**
**FOR SETTLEMENT/LICENSING PURPOSES ONLY**

Re:   NCR e-Commerce Patents – Alticor

Dear Ralph:

This is a follow-up letter to our ongoing discussions regarding the e-commerce activities of Alticor and the various patents owned by our client NCR Corporation. We seek to correct and comment on some of the statements that you have made.

Since you met with Cliff Michel, NCR has filed four new e-commerce patent infringement complaints and negotiated additional licensing agreements. You client is currently not, however, on our litigation list.

As you know, many other companies have taken licenses to the patents in question. Many licensees have raised the same questions that you have. For your reference, we have attached a chart displaying the number of licensees for each of the e-commerce patents.

**Siefert '791**

**Elements 9(a) and 9(d)**

In reference to elements 9(a) and 9(d), you contend that Quixtar maintains a "redundant server farm" and that the servers located in warehouses do not satisfy the LOCAL SERVER limitation of Siefert '791 Claim 9.

Contrary to what you suggest, LOCAL SERVERs and REGIONAL SERVERs do not have to be at distinct geographical locations. Claim 1(d) of the '791 patent provides for "allowing a user to add a RESOURCE to one of the LOCAL SERVERs to create a PROFILE for the added

OHS East:160076106

EXHIBIT
7


ORRICK

Ralph J. Gabric, Esq.
November 14, 2006
Page 2

RESOURCE, and to add the created PROFILE to one of the REGIONAL SERVER[s] … ." U.S. Patent No. 5,991,791 (filed Nov. 23, 1999). While RESOURCEs are stored on the LOCAL SERVERs, and PROFILEs are stored on REGIONAL SERVERs, this does not mean that LOCAL SERVERs and REGIONAL SERVERs cannot be located in the same location. The distinction simply acknowledges the sense in having some server memory dedicated towards managing RESOURCEs at the warehouse level, and separate server memory dedicated towards managing PROFILEs of the RESOURCEs at the website level. We would be surprised to learn that the web servers that interact with users are identical in every respect with the servers that provide service at your warehouse locations.

### Siefert '403

#### Element 7(b)

We understand you to argue that element 7(b) of the '403 patent is a "means-plus-function" element, and that the 'means' for performing the stated function is therefore limited to the structures specifically disclosed in the specification, and to equivalents thereof. More specifically, you cite to figures 7, 84 and 85. As an initial matter, we note that the use of "means-plus" or "step-for" language does not necessarily make an element a means- (or step-) plus function element. *See Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999). To the extent that element 7(b) is a "means-plus-function" one, we note that "[c]ourts are required to view the claimed invention as a whole." *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1567 (Fed. Cir. 1987). Claim interpretation must occur in light of the specification, claim language, other claims and prosecution history. *Id.* The specification describes a number of ways in which the invention can be practiced. The diagrams in the figures merely illustrate examples of practicing the invention and are intended to enable the user to create an operable program. The specification confirms this. Figures 84 and 85 are flow charts of the logic followed by the illustrative program contained in the microfiche appendix. The illustrative program in the appendix enables a user to write code which can run on various processors, including the 80X86 family of microprocessors. *Id.* at col. 20, l.23-30. Further, to the extent that these figures act as limitations on the claim terms, we ask you to specify how those limitations make the Quixtar system non-infringing.

### Siefert '096

#### Elements 1(a) and 1(c)

From our discussions with you, it appears that you have incorrectly assumed that a user's actual access to a PROFILE must occur at step 1(a) of the '096 patent. The '096 patent provides, in


ORRICK

Ralph J. Gabric, Esq.
November 14, 2006
Page 3

pertinent part, as follows:

> 1. A method of retrieving a physical object, comprising the following steps:
> (a) enabling access to a PROFILE describing the physical object;
> (b) enabling the physical object to be listed in response to a request made by a user;
> (c) enabling the user to select the listed physical object and view the PROFILE … .

U.S. Patent No. 6,502,096 (filed Dec. 31, 2002). You contend that actual access in the Quixtar system does not occur at step 1(a), which requires enablement of the "physical object to be listed in response to a request made by a user." In fact, actual access does not have to occur until step 1(c), when the user selects a hyperlink associated with a product. Pursuant to element 1(c), selecting a hyperlink enables the user to "select the listed physical object and view the PROFILE." We conveyed this in the claim charts previously provided.

**Element 1(d)**

We understand you to argue that 1(d) is not present in Quixtar because it incorporates a credit card approval sub-process into your e-commerce transactions. It is clear that a credit card approval is not an intervening step that allows Alticor to escape liability.

You rely on a file history argument and reference the fact that the applicant disclaimed a certain type of "approval" during the prosecution of the application. Claim 1 of the '096 patent provides, in pertinent part, as follows:

> 1. A method of retrieving a physical object, comprising the following steps:
> …
> (d) enabling the user to place an order for delivery of the selected physical object;
> (e) enabling notification of a custodian of the physical object when the order is placed;
> … .

During the prosecution of the '096 patent, the examiner initially rejected the claim as being unpatentable over Wojcik, U.S. Patent No. 5,666,493 (filed Aug. 24, 1993) ("Wojcik"). Wojcik described a system that included a catalog and possible access to vendor catalogs. In order to overcome the examiner's rejection, the applicant noted that:

> Wojcik requires approval … the purchases require involvement of two parties … . Wojcik does not "enable" "the user to place an order" as in claim 8(d). The reason is that Wojcik only enables the user WITH APPROVAL to place the order. Claim 8(d) does not contain


ORRICK

Ralph J. Gabric, Esq.
November 14, 2006
Page 4

that restriction.

The 'approval' described by Wojcik is completely different from a mere credit card approval, which is an obvious and accepted part of any transaction involving credit cards. The Wojcik approval arises out of an extended and interactive purchasing process wherein the vendor provides quotes and transmits contracts back and forth. *See* Wojcik at col. 20, lines 30-35. Communications may even have to be supplemented by fax, phone and release orders. *Id.* Final approval from the vendor's end requires the participation of person(s) with the authority to approve the purchase transaction. *Id.* at fig. 37.

In contrast, and from the end user's perspective, a credit card approval is an invisible component of e-commerce transactions falling under '096 and does not require further participation of the buyers or sellers. Clearly, this sort of approval is very different from the extended approval process described by Wojcik.

**Siefert '855**

**Claims 1 and 2**

You also cite to a Hill reference and allege that the same anticipates both of the claims at issue. You construe the claims at issue as "step-plus-function" claims. As we noted above, the mere use of "step-for" or "step-of" language does not necessarily make an element a means- (or step-) plus-function element. Rather, the critical inquiry is whether the claimed element describes a function rather than an act. *See Seal-Flex, Inc. v. Athletic Track and Court Construction*, 172 F.3d 836, 839 (Fed. Cir. 1999). If the latter is the case, then an element is a not a "means-plus" one. We ask you to identify which portions of the specification act as limitations on the claim terms, and how the same should be construed as to make the Quixtar system non-infringing.

**Element 1(a)**

We understand you to assert that the Quixtar system "searches on resources within a field" and that this distinguishes the system from that claimed in Siefert '855. This Siefert system, however, covers the display of all resources or, alternatively, the display of various resources based on executed searches. *See id* at col. 9, lines 59-64.

**Element 1(b) and 1(c)**

Finally, you allege that graphics files are located on a server hosted by Akamar, presumably,


ORRICK

Ralph J. Gabric, Esq.
November 14, 2006
Page 5

a third party vendor. We note that the claims do not require that the graphic files be located at your place of business. Elements 1(b) and 1(c), for example, merely require that a graphical image associated with a PROFILE be displayed on the Quixtar system when a user accesses the PROFILE. *See* U.S. Patent No. 6,480,855 (filed Nov. 12, 2002). Further, we bring your attention to the fact that one can still be liable under 35 U.S.C. § 271(a) for "using" infringing services or software that meet each limitation of the subject patent claims.

We also rely on traditional theories of agency, joint liability, and induced infringement liability. Alticor has joint liability under 35 U.S.C. § 271(a), a theory which was recently recognized and endorsed by the Federal Circuit. *See On Demand Machine Corp. v. Ingram Indus.*, 442 F.3d 1331, 1344 (Fed. Cir. 2006) (finding no error in jury instruction which provided that "[w]hen infringement results from the participation and combined action(s) of more than one person or entity, they are all joint infringers and jointly liable for patent infringement."). Under the theory of joint liability,

> [w]hen infringement results from the participation and combined action of several parties, they are all joint infringers and jointly liable for patent infringement. ... Infringement of a patented process or method cannot be avoided by having another perform one step of the process or method.

*Shields v. Halliburton Co.*, 493 F. Supp. 1376, 1389 (W.D. La. 1980); *Applied Interact, LLC v. The Vermont Teddy Bear*, No. 04 Civ. 8713, 2005 U.S. Dist. LEXIS 19070, at *17 (N.D. Ill. April 29, 2003) (company may be liable for infringement if it, together with its customers, performed all of the steps of the disputed claims).

Alticor is also liable under general principles of agency law, which apply to patent infringement. *Crowell v. Baker Oil Tools*, the seminal case on this issue, provides, in pertinent part, as follows:

> It is obvious that one may infringe a patent if he employ [sic] an agent for that purpose or have [sic] the offending articles manufactured for him by an independent contractor. [It is not necessary] that appellant himself be a manufacturer of the alleged infringing devices or that he have machinery or manufacturing facilities or employees to make them or a written or an oral contract for supplies for such manufacture.

*Crowell v. Baker Oil Tools, Inc.*, 143 F.2d 1003, 1004 (9th Cir. 1944).


ORRICK

Ralph J. Gabric, Esq.
November 14, 2006
Page 6

In a more recent case, a court held that the defendant, who had ordered a printer, newspaper and advertising agent to execute the steps of a patent covering a method for advertising in a newspaper, had induced infringement under 35 U.S.C. § 271(b). *Free Standing Stuffer Inc. v Holly Development Co.*, No. 72 C 1070, 1974 U.S. Dist. LEXIS 11420, at *33, 44-45 (N.D. Ill. Dec. 12, 1974). In *Free Standing Stuffer, Inc.*, the court noted that "interposing an agent or independent contractor between the principal and the infringing acts does not absolve the principal of liability." *Id.* ("even if defendant were held not to be liable for the acts of its agents and contractors, defendant nevertheless would be liable as an infringer for having actively induced infringement of the patent under § 271(b)").

Moreover, induced infringement liability under section 35 U.S.C. 271(b) can be established even where an agency relationship is absent. 35 U.S.C. § 271(b) provides that "whoever actively induces infringement of a patent shall be liable as an infringer." Thus, a person infringes by actively and knowingly aiding and abetting another's direct infringement of the patent. An alleged infringer knowingly induces infringement with "a specific intent to encourage another's infringement." *Trustees of Columbia University v. Roche Diagnostics GMBH*, 272 F. Supp. 2d 90, 104 (D. Mass. 2002).

### Paperniak '931

#### Claim 1

You indicate that Quixtar does not rely on the three maps named in claim 1 of the '931 patent: a page map, a user session map, and a user session page map. Before we can fully evaluate your statement, you should tell us more about the type of information that you maintain about a user's navigation through the Quixtar website.

### Anand '496

#### Element 9(b)

You next point to element 9(b) and assert that claim 9 is a "means-plus function". As we noted above, the use of "mean-for" language does not automatically mean that a claim or element should be interpreted as a "means-plus" one. You rely on the holding in the *WMS Gaming* case, in further support of your argument. The *WMS Gaming* case merely reaffirms the general proposition that, with respect to "means-plus-function" claims where computers are disclosed, the scope of the "means" for performing the stated function is not limited to what a computer does generally. *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F. 3d 1339, 1349 (Fed. Cir. 1999). Instead, the scope is


ORRICK

Ralph J. Gabric, Esq.
November 14, 2006
Page 7

limited to what the computer that is programmed to perform the subject algorithm does, and to equivalents of the same. *Id.* We do not claim that the '496 patent covers what a computer does generally. Instead, the '496 patent claims, for example, the algorithm by which requests for analyzing data in a database are received, and whereby the data is analyzed and subsequently generated in a report, and to equivalents of the same. *See* U.S. Patent No. 5,832,496 (filed Nov. 3, 1998).

You then claim that Quixtar simply links to the underlying data and does not analyze it, and that this is not enough to support element 9(b). We refer you to the claim charts that we previously transmitted to your client. Clearly, Quixtar does more than link to the underlying data; it retrieves, analyzes and generates a report based on the analysis. One can confirm this by reference to the Quixtar web pages. As we noted in our claim charts, Quixtar states the following on its interface:

> The MicroStrategy Business Intelligence PlatformTM mitigates those complexities, providing a common basis for analysis, both ad hoc and standardized…MicroStrategy Desktop allows users to create reports that access the full depth and breadth of the largest EDWs. MicroStrategy technology accomplishes this through a highly proprietary and highly optimized SQL Engine that dynamically creates new optimized SQL whenever a report is run, or whenever a user drills anywhere back into the data warehouse.

To the extent that a third party performs these steps, we bring your attention to the fact that one can still be liable under 35 U.S.C. § 271(a) for "using" infringing services or software that meet each limitation of the subject patent claims. We also rely on traditional theories of agency, joint liability, or induced infringement liability.

### Papierniak '997

#### Claim 11

You assert that the specification indicates that the limitations must appear on the "front end", as there are numerous references to web pages. You further allege that the claim chart reads onto the "back end" applications of Quixtar, and that therefore, claim 11 is not infringed. To the extent that your claim chart reads onto the "back end" application (which we ask you to specifically define), we refer you to the specification, which makes numerous references to a "utility application" and to a data processing computer with collection, processing and storage capabilities, and which operates over an intranet. *Id.* at col. 1, lines 19-29. These references clearly indicate that the limitations need not appear only on the front end; the limitations also have "back end" components which are distinct from services provided on the web site.


ORRICK

Ralph J. Gabric, Esq.
November 14, 2006
Page 8

### Shelton '643

#### Element 1(d)

You point to claim element 1(d) of the '643 patent, which calls for "monitoring activities", and contend that the mere use of cookies is not enough to satisfy this limitation, as an active step is required. In fact, we are not claiming that the use of "cookies" constitutes evidence of infringement. Instead, we claim that the use of "cookies" is evidence of the Quixtar's system's use of various session management techniques that infringe the '643 patent.

### O'Flaherty '203

#### Claim 10

You assert that claim 10, which calls for "extending a database table ... to include at least one data control column for storing data control information" is not present in the Quixtar system. You also assert that "masking [of] the data in accordance with the consumer privacy parameter", as provided for in claim 10, does not exist in the Quixtar system. Specifically, you contend that the Quixtar system merely retrieves a subset of data for use by servicing IPOs, and that this is sort of activity does not satisfy the forgoing limitations. We believe that the very act of storing, in a database, personal information that may be subject to privacy concerns, is enough to satisfy the 'extending' limitation. This is confirmed by reference to the specification, which merely requires that the database, during creation or after, contain "one data control column for storing data control information reflecting at least one consumer privacy parameter..." U.S. Patent No. 6,253,203 (filed June 26, 2001) at col. 3, lines 2-5. Further, the selective filtering of information, when retrieving or displaying information from the database, in accordance with consumer privacy specification, is also enough to satisfy the 'masking' limitation. While the specification refers to the possibility of encrypting private information, encryption is not the only means of practicing the invention. *Id.* at col. 10, lines 40-49. What is important is whether certain types of information fall under the 'opt-in' category, and can be disclosed to third parties, such as servicing IPOs. *Id.* at col. 9, lines 53-65.

### Conclusion

Many of our licensees and potential licensees have given us access to their information technology officers or to other members of their information technology team. In the spirit of cooperation, you may also want to provide the same, or at least provide additional documentation of your systems, to the extent that you believe that our analysis is factually incomplete.


**ORRICK**

Ralph J. Gabric, Esq.
November 14, 2006
Page 9

    Thank you in advance to your attention to this matter. We are prepared to discuss these NCR patent claims in further detail, as we have with patent counsel representing literally dozens of present NCR e-commerce patent licensees. We respectfully suggest, however, that rather than engage in an extended writing campaign, it would be best for us to meet in person again, with you and your clients to discuss these matters.

                        Sincerely,

                        Paul R. Gupta

cc:    Bruce A. Langos, Senior Vice President of Global Operations, NCR Corporation
        Todd B. Carver, Law Vice President & Chief Counsel, Teradata Division, NCR Corporation

Encl.